

STATE OF RHODE ISLAND                    AND PROVIDENCE PLANTATIONS

## SUPERIOR COURT

**X** *Providence/Bristol County*
   Licht Judicial Complex
   250 Benefit Street
   Providence, Rhode Island 02903

———— *Kent County*
   Kent County Courthouse
   222 Quaker Lane
   Warwick, Rhode Island 02886

———— *Newport County*
   Murray Judicial Complex
   45 Washington Square
   Newport, Rhode Island 02840

———— *Washington County*
   McGrath Judicial Complex
   4800 Tower Hill Road
   Wakefield, Rhode Island 02879

CIVIL ACTION, FILE NO. PB12-3226

PAZ Productions, LLC and Chad A. Verdi
          **Plaintiffs**

Angelo Pizzo and Q&A Productions, Inc.
          **Defendants**

## *Summons*

*To the above-named Defendant:*  Angelo Pizzo
      2121 S. High Street, Bloomington, Indiana 47401

The above-named Plaintiffs has brought an action against you in said Superior Court in the county indicated above. You are hereby summoned and required to serve upon  Richard L. Gemma, Esq., #3953
Plaintiff's attorney, whose address is ____ Wieck DeLuca & Gemma Incorporated
   56 Pine Street, Suite 700, Providence, RI  02903
an answer to the complaint which is herewith served upon you within 20 days after service of this summons upon you, exclusive of the day of service.

If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Your answer must also be filed with the court.

As provided in Rule 13(a), unless the relief demanded in the complaint is for damage arising out of your ownership, maintenance, operation, or control of a motor vehicle, or unless otherwise provided in Rule 13(a), your answer must state as a counterclaim any related claim which you may have against the Plaintiff, or you will thereafter be barred from making such claim in any other action.

                                     _____,
                                          CLERK

Dated: ................................................

**(Seal of the Superior Court)**

S-135
Superior-1 (revised January 2011)

# State of Rhode Island and Providence Plantations

.......................................................,SC

## PROOF OF SERVICE

I hereby certify that on the ........................................... day of ................................................. I served a copy of this

summons and a copy of the complaint received therewith upon ..........................................................................................

..............................................................................................................................................................................

in the following manner:

By delivering a copy of the summons and complaint to him/her personally.

By leaving a copy of the summons and complaint at his/her dwelling house, ..........................................................

................................................................................................, with a person of suitable age and discretion then

residing therein.            (Address)

By leaving a copy of the summons and complaint at his/her usual place of abode, .............................................

................................................................................., with a person of suitable age and discretion then

residing therein.

By delivering a copy of the summons and complaint to an agent authorized by appointment or by law to

receive service of process, namely.................................................................................................................................

such agent being one designated by statute to receive service, further notice as the statute requires was given

as follows:

..............................................................................................................................................................................

..............................................................................................................................................................................

..............................................................................................................................................................................

Sheriff's Fees

   Travel............................ $............................

   Service........................ $............................

                    $............................

                                                      ...................................................................

                                                                        Deputy Sheriff

NOTE: Returnable to Plaintiff's Attorney forthwith after service. Proof of service to be filed within time during which the person served must respond.

Richard L. Gemma, Esq., #3953
Wleck DeLuca & Gemma, Inc.
56 Pine Street, Suite 700
Providence, RI 02903
Tel. 401-454

ATTORNEY FOR PLAINTIFF

Angelo Pizzo and
Q&A Productions, Inc.

vs

PAZ Productions, LLC and
Chad A. Verdi

SUPERIOR COURT

SUMMONS

FILE NO. PB 12-3326

CIVIL ACTION



## BUSINESS CALENDAR CASE OPENING SHEET

STATE OF RHODE ISLAND
SUPERIOR COURT

Case # PB12 -3226

| PLAINTIFF: | DEFENDANT: |
|---|---|
| PAZ Productions, LLC and Chad A. Verdi | Angelo Pizzo and Q&A Productions, Inc. |

| PLAINTIFF'S COUNSEL: | DEFENDANT'S COUNSEL: |
|---|---|
| (If more than one supply information for each) | (If more than one supply information for each) |
| Name: Richard L. Gemma, Esq. | Name: |
| Address: 56 Pine Street, Ste. 700, Providence, RI | Address: |
| Telephone No. 401-454-8706 | Telephone No. |
| Name: | Name: |
| Address: | Address: |
| Telephone No. | Telephone No |

**NATURE OF PROCEEDING** -- Check the applicable case type under main categories listed below (check only one)

☑ Breach of contract or fiduciary duties, fraud, misrepresentation, business tort or statutory violations arising out of business dealings and/or transactions.

❑ Transactions governed by the provisions of the Uniform Commercial code.

❑ Complicated transactions involving commercial real property.

❑ Shareholder derivative actions.

❑ Commercial class actions.

❑ Commercial bank transactions

❑ Matters affecting the internal affairs or governance of business organizations or entities.

❑ Business insolvencies and receiverships.

❑ Other (generally describe nature) _____

_____

Have there been efforts at mediation?          Yes____    No ✓
Have there been efforts at arbitration?          Yes____    No ✓
Other dispute resolution mechanisms?          Yes____    No ✓

Is this a case that may require a trial for resolution?    ☑Yes    ❑ No    If yes: ☑Jury or ❑ Non-jury

If this is a case that was filed prior to June 4, 2001, what is the present status?
❑ Motion to Dismiss    ❑ Summary Judgment    ❑ Discovery    ❑ Awaiting assignment for trial

The undersigned requests assignment to the Business calendar --

DATE:  6/16/12

Attorney for plaintiff/defendant (strike one)
Attorney ID# 3953

The above case may be placed on the Business Calendar _____
Associate Justice

BLUE - COURT          YELLOW - PLAINTIFF          PINK - DEFENDANT          GOLD - JUDGE
S-221(5/01)

STATE OF RHODE ISLAND                          SUPERIOR COURT
PROVIDENCE, SC

PAZ Productions, LLC and Chad A. Verdi,   :
                 Plaintiffs,   :
                              :
vs.   :   C.A. No. 12 PB12 -3226
                              :
Angelo Pizzo and Q&A Productions, Inc.,   :
                 Defendants.   :

## COMPLAINT

### PARTIES

      1.      Plaintiff, PAZ Productions, LLC, is a limited liability company organized and

existing under the laws of the State of Rhode Island ("Paz Productions") with its registered agent

and thus its registered office located at 56 Pine Street, Suite 700, Providence, Rhode Island

02903.

      2.      Plaintiff, Chad A. Verdi ("Verdi"), is an individual who resides in East

Greenwich, Rhode Island.

      3.      Defendant, Angelo Pizzo ("Pizzo"), upon information and belief, is an individual

who resides at 2121 S. High Street, Bloomington, Indiana 47401.

      4.      Defendant, Q & A Productions, Inc. ("Q&A"), upon information and belief, is a

corporation organized and existing under the laws of the State of Indiana with an address of 807

N. College Avenue, Suite 102, Bloomington, Indiana 47404.

### JURISDICTION

      5.      Each of Pizzo and Q&A has sufficient contacts with the State of Rhode Island for

this Court to exercise personal jurisdiction over them. As set forth below, Pizzo and Q&A

entered in a contract with Paz Productions, a Rhode Island limited liability company, pursuant to

which Pizzo was engaged to write a screenplay of a motion picture project entitled "Paz: The

Vinny Pazienza Story. The claims against Pizzo and Q&A contained in the Complaint relate to their purposeful contacts in and to the State of Rhode Island. Pazienza is one of the most famous professional boxers ever born and raised in Rhode Island, and the screenplay was to cover Pazienza's life and his heroic come back from a life-threatening injury - all occurring in the State of Rhode Island. Pizzo and Q&A, by and through Pizzo, travelled to the State of Rhode Island in anticipation of and/or in preparation of the writing of the screenplay. Pizzo, and Q&A by and through Pizzo, travelled to and met in the State of Rhode Island with Vinny Pazienza, and Vinny Pazienza's family members and/or friends. Pizzo and Q&A, by and through Pizzo, met in the State of Rhode Island with representatives of Paz Production and a potential Rhode Island investor and/or lender to the film. Pizzo and Q&A, by and through Pizzo, communicated with and forwarded via email proposed forms of the screenplay to Paz Productions' representative in Rhode Island.

6.     This Court has subject matter jurisdiction over this matter pursuant to R.I.G.L. § 8-2-14.

BACKGROUND

7.     On or about July 5, 2010, Paz Productions entered into a Writing Services Agreement with Pizzo and Q&A, pursuant to which Pizzo was engaged to write a screenplay for the motion picture project entitled "Paz: The Vinny Pazienza Story" ("Project"). A copy of the Writing Services Agreement is attached to the Complaint as Exhibit A ("WS Agreement").

8.     The WS Agreement set forth certain time frames with respect to preparation of, inter alia, the "First Draft Screenplay", stating that "Time is of the essence respecting the writing services and delivery dates specified herein". See ¶3(d), WS Agreement, Exhibit A.

9.     Pizzo was given directions, instructions and/or requirements with respect to the

2

preparation of the screenplay, including without limitation, that the screenplay was to present an inspirational feel-good film like the movie The Blind Side, and in which Pazienza suffers his neck injury within the first thirty (30) minutes of the film.

10.     The WS Agreement required Pizzo to work exclusively on the screenplay. See ¶3(f), WS Agreement, Exhibit A.

11.     After the WS Agreement was executed, there was a change in the Paz Productions' management. Pizzo was upset with the change.

12.     For numerous months, Pizzo failed and/or refused to comply with the deadline set forth in the WS Agreement.

13.     In April, 2011 Pizzo admitted that it was his "fault", and that he was "negligent in severe way" in failing to perform his responsibilities and/or obligations under the WS Agreement. A copy of Pizzo's email is attached to the Complaint as Exhibit B.

14.     After repeated prodding, Pizzo finally provided to Paz Productions, in parts over a period of time stretching from May 18 to May 26, 2011, some form of the screenplay.

15.     The screenplay provided by Pizzo was in breach of the WS Agreement, untimely, unacceptable, and failed to be written in accordance with Paz Productions' directions, instructions and/or requirements, and was rejected by Paz Productions.

16.     Pizzo has always been the true party of interest to the WS Agreement. In 2011, Pizzo submitted and/or caused to be submitted a claim to arbitration, stating that "on or about July 5, 2010, Respondents (i.e. Paz Productions and Verdi) entered into an employment agreement with Angelo Pizzo ("Writer") to engage Writer for writing services consisting of a first draft screenplay and rewrite in connection with the Project." See ¶4, p.2, of Arbitration Claim, a copy of which is attached hereto as Exhibit C.

3

17.   The arbitrator does not have jurisdiction to adjudicate and/or render an award on the claims in the within Complaint as the claims exceed the jurisdictional maximum authority, and/or scope of the arbitration proceeding.

## COUNT I
### (Breach of Contract)

18.   Paz Productions incorporates by reference paragraphs one (1) through seventeen (17) above as if fully set forth herein.

19.   As set forth above, each of Pizzo and Q&A has breached his/its respective contractual obligations under the WS Agreement.

20.   As a direct and proximate result of the aforesaid breach, Paz Productions has suffered damages, including without limitation, the loss of more than $1.5 million dollars in financing for the Project, and continues to suffer damages.

WHEREFORE, Paz Productions demands that this Court (i) enter judgment in favor of Paz Productions against Pizzo and Q&A, jointly and severally, for compensatory damages in an amount exceeding $1,500,000, plus interest, costs, and attorneys' fees and expenses as allowed by law; and (ii) award Paz Productions any other and further relief that this Court deems meet and just.

## COUNT II
### (Breach of Good Faith and Fair Dealing)

21.   Paz Productions incorporates by reference paragraphs one (1) through twenty (20) above as if fully set forth herein.

22.   There is an implied covenant of good faith and fair dealing in the WS Agreement.

23.   As set forth above, each of Pizzo and Q&A has breached his/its respective covenants of good faith and fair dealing implied in the WS Agreement.

24.   As direct and proximate result of the aforesaid breach, Paz Productions has

4

suffered damages, including without limitation, the loss of more than $1.5 million dollars in financing for the Project, and continues to suffer damages.

WHEREFORE, Paz Productions demands that this Court (i) enter judgment in favor of Paz Productions against Pizzo and Q&A, jointly and severally, for compensatory damages in an amount exceeding $1,500,000, plus interest, costs and attorneys' fees and expenses as allowed by law; and (ii) award Paz Productions any other and further relief that this Court deems meet and just.

<u>COUNT III</u>
(Breach of Contract/Third Party Beneficiary)

25.    Verdi incorporates by reference paragraphs one (1) through twenty-four (24) above as if fully set forth herein.

26.    In connection with the WS Agreement, Verdi entered into a Guarantee Agreement, pursuant to which Verdi guaranteed the obligations of Paz Productions under, <u>inter alia</u>, the WS Agreement.

27.    Verdi executed the Guarantee Agreement based upon the commitments, covenants and/or representations of Pizzo and/or Q&A that they would fulfill their obligations and/or responsibilities under the WS Agreement.

28.    Circumstances indicate that Verdi was an intended beneficiary of the WS Agreement, and third party beneficiary of the WS Agreement.

29.    As set forth above, each of Pizzo and Q&A has breached their contractual obligations and/or their obligations of good faith and fair dealing under the WS Agreement.

30.    Verdi is the sole member of Paz Productions owning one hundred (100%) percent of the membership interest of Paz Productions.

31.     As a direct and proximate result of the aforementioned wrongful conduct, Verdi has suffered and continues to suffer damages, including the loss of more than $400,000 in acquisition, development, production costs and investments, plus claimed liability under the Guarantee Agreement, and attorney's fees and costs incurred in connection with the defense of the arbitration proceeding.

WHEREFORE, Verdi requests that this Court (i) enter judgment in favor of Verdi against Pizzo and Q&A, jointly and severally, for compensatory damages in an amount exceeding $400,000 plus interest, costs and attorneys' fees and expenses as allowed by law; and (ii) award Verdi any other and further relief that this Court deems meet and just.

## COUNT IV
### (Negligence)

32.     Verdi incorporates by reference paragraphs one (1) through thirty-one (31) above as if fully set forth herein.

33.     Each of Pizzo and Q&A owed to Verdi a duty of care in the preparation of a timely and quality screenplay in accordance with the directions, instructions and requirements provided.

34.     As set forth above, each of Pizzo and Q&A, by and through Pizzo, failed to exercise the care that a reasonably prudent person would do under same or similar circumstances, and breached the duty of care in the preparation of a timely and quality screenplay in accordance with the directions, instructions and requirements provided.

35.     As a direct and proximate result of the aforesaid breach, Verdi has suffered and continues to suffer damages, including without limitation, the loss of more than $400,000 in acquisition, development, production costs and investments, plus claimed liability under the

Guarantee Agreement, and attorney's fees and costs incurred in connection with the defense of the arbitration proceeding.

WHEREFORE, Verdi requests that this Court (i) enter judgment in favor of Verdi against Pizzo and Q&A, jointly and severally, for compensatory damages in an amount exceeding $400,000 plus interest, costs and attorneys' fees and expenses as allowed by law; and (ii) award Paz Productions any other and further relief that this Court deems meet and just.

## COUNT V
### (Negligence)

36.     Paz Productions incorporates by reference paragraphs one (1) through thirty-five (35) above as if fully set forth herein.

37.     Each of Pizzo and Q&A owed to Paz Productions a duty of care in the preparation of a timely and quality screenplay in accordance with the directions, instructions and requirements provided.

38.     As set forth above, each of Pizzo and Q&A, by and through Pizzo, failed to exercise the care that a reasonably prudent person would do under same or similar circumstances, and breached the duty of care in the preparation of a timely and quality screenplay in accordance with the directions, instructions and requirements provided.

39.     As a direct and proximate result of the aforesaid breach, Paz Productions has suffered damages, including without limitation, the loss of more than $1.5 million dollars in financing for the Project, and continues to suffer damages.

WHEREFORE, Paz Productions demands that this Court (i) enter judgment in favor of Paz Productions against Pizzo and Q&A, jointly and severally, for compensatory damages in an amount exceeding $1,500,000, plus interest, costs, and attorneys' fees and expenses as allowed

7

by law; and (ii) award Paz Productions any other and further relief that this Court deems meet

and just.

**PLAINTIFFS DEMAND A TRIAL BY JURY WITH RESPECT TO ALL ISSUES AND
CLAIMS SO TRIABLE.**

_____
Richard L. Gemma, Counsel to Plaintiffs
PAZ Productions, LLC and Chad A. Verdi

PAZ Productions, LLC and Chad A. Verdi

By their attorneys,

_____
Richard L. Gemma, Esq. #3953
Wieck DeLuca & Gemma Incorporated
56 Pine Street, Suite 700
Providence, RI  02903
Telephone:  (401) 454-8706
Facsimile:  (401) 454-8755
Dated: June 26, 2012

G:\Verdi, Chad\Paz Productions, LLC\Pleadings\Complaint 061112.docx

8

## WRITING SERVICES AGREEMENT

The following will confirm the Writing Services Agreement (the "Agreement") entered into as of _____, 2010 between PAZ PRODUCTIONS, LLC ("Producer"), which is a WGA signatory, and Q&A Productions, Inc. ("Lender") f/s/o Angelo Pizzo (collectively referred to herein as "Writer") with respect to Writer's writing services in connection with a proposed feature-length, theatrical motion picture presently entitled "Paz: The Vinny Pazienza Story" (the "Picture") to be based on the life story of Vinny Pazienza as conceived of and created by Producer (the "Work").

A.   CONDITION PRECEDENT:  All of Producer's obligations under this Agreement are conditioned upon (i) Producer's receipt of Writer's completed and certified Employment Eligibility Verification (Form I-9) in compliance with the Immigration Reform and Control Act of 1986, and (ii) Producer's receipt of copies of the Agreement and the Certificate of Authorship executed by Writer attached hereto.

1.   ENGAGEMENT:  Producer hereby engages Writer on a "pay-or-play" basis for the purpose of writing a complete first draft screenplay (the "First Draft Screenplay") and a rewrite of the First Draft Screenplay ("Rewrite"), all of which suitable for use in connection with the Picture. The First Draft Screenplay (and all other writing steps ordered as performed hereunder) shall be written in accordance with and incorporate such materials, ideas, concepts, directions, changes and/or suggestions as may be presented to Writer by Producer.

2.   ADDITIONAL WRITING SERVICES:   Producer shall have the option (but not the obligation) (the "Additional Writing Option(s)"), exercisable at any time within eighteen (18) months following delivery of the First Draft Screenplay and Rewrite, to engage Writer's services for the purpose of preparing a polish thereto (the "Optional Polish") suitable for use in connection with the Picture. The First Draft Screenplay, Rewrite and, as applicable, the Optional Polish, are hereinafter sometimes collectively and individually referred to as the "Screenplay."

3.   SCHEDULE FOR PERFORMANCE:

(a)   First Draft Screenplay

| | |
|---|---|
| Start of Services: | Upon Writer's execution of this Agreement. |
| Writing Period: | Ten (10) weeks |
| Reading Period: | Four (4) weeks |

(b)   Rewrite

| | |
|---|---|
| Start of Services: | Upon Producer's approval of the First Draft Screenplay, but in no event later than the expiration of the Reading Period set forth above. |
| Writing period: | Eight (8) Weeks. |
| Reading Period: | Four (4) Weeks |





(c)     Optional Polish

Optional Polish Writing Period:  Four (4) Weeks From commencement of
Optional Polish Writing Period.

(d)     Timeliness:     Time is of the essence respecting the writing services and
delivery dates specified herein.  During all Reading Periods, Writer shall, subject to Writer's
prior professional commitments, remain available to meet with Producer as and where Producer
may reasonably designate in order to discuss the Screenplay and any contemplated changes
Producer may desire with respect thereto. Upon expiration of any Reading Period and subject to
Producer's timely payment of all sums due hereunder (or earlier upon Producer's request) Writer
shall immediately commence rendering services to Producer in connection with each applicable
writing step.

(e)     Deferral:     Producer may defer Writer's services on any writing step
(including, without limitation, optional writing steps) to such other time as Producer elects,
provided that if Writer's services are deferred, (i) such deferral shall be for a period of no more
than one (1) year in the aggregate, (ii) Producer shall make payment for such step as if it was
timely ordered and delivered on, and (iii) Writer's services shall then be subject to Writer's
availability respecting prior professional commitments.

(f)     Exclusivity:     The writing services of Writer shall be exclusive to
Producer during all writing periods.

4.     CONSIDERATION:

(a)     With regards to First Draft Screenplay and Rewrite and provided that
Writer keeps and performs all of Writer's material obligations and agreements hereunder, and
satisfactorily renders and completes all material services required by Producer hereunder, Lender
shall be entitled to receive, as full and complete consideration for all of Writer's services, all of
the results and proceeds of Writer's services, all of the rights granted or to be granted to Producer
and all of Writer's representations, warranties and indemnifications hereunder, the sum of Two
Hundred Thousand Dollars ($200,000) which shall be payable as follows: (i) Sixty Thousand
Dollars ($60,000) upon Writer's execution of this Agreement; (ii) Sixty Thousand Dollars
($60,000) upon delivery of the First Draft Screenplay; (iii) Forty Thousand Dollars ($40,000)
upon commencement of the Rewrite; and (iv) Forty Thousand Dollars ($40,000) upon delivery
of the Rewrite. In addition, Producer shall pay all applicable union "fringe" payments (i.e.,
WGA pension, health, and welfare payments).

(b)     If Producer exercises the Additional Writing Option, then provided that
Writer keeps and performs all of Writer's material obligations and agreements hereunder, and
satisfactorily renders and completes all material services required by Producer hereunder, Lender
shall be entitled to receive, as full and complete consideration for all of Writer's services in
connection with, as applicable, the Optional Polish, the following applicable sums:

(i)      If Producer exercises the option for the Optional Polish a sum in the amount equal to Forty Thousand Dollars ($40,000) to be payable as follows: (A) one half (½) of such sum (i.e., Twenty Thousand Dollars [$20,000] upon commencement of Writer's services on such Optional Polish; and  (B) one half (½) of such sum (i.e., Twenty Thousand Dollars [$20,000] upon delivery of such Optional Polish.

5.      PRODUCTION BONUS:

(a)      If the Picture is produced, and upon final credit determination pursuant to the WGA Agreement (but not pursuant to Paragraph 7 of Theatrical Schedule A of such WGA Agreement) in accordance with Paragraph 8 hereof ("Final WGA Credit Determination"), Writer is entitled to receive sole "Screenplay by" or "Written by" credit for the Picture, and provided further that Writer is not in material, uncured default hereof, Lender shall be entitled to receive consideration in an amount equal to two and one-half percent (2.5%) of the approved "going-in" budget ("Budget") upon commencement of principal photography of the Picture ("Sole Credit Production Bonus"), such amount payable to Lender within five (5) days following Producer's receipt of Final WGA Credit Determination; it being understood, however, that any amount paid to Lender pursuant to Paragraph 4 above shall be applicable against such Sole Credit Production Bonus.

(b)      If the Picture is produced, and, upon Final WGA Credit Determination (but not pursuant to Paragraph 7 of Theatrical Schedule A of such WGA Agreement), Writer is entitled to receive shared "Screenplay by" or "Written by" credit for the Picture, Lender shall be entitled to receive consideration in an amount equal to one-half (1/2) of the amount to be paid to Writer as set forth in Paragraph 5(a) (above) ("Shared Credit Production Bonus") such amount payable to Lender five (5) days following Producer's receipt of Final WGA Credit Determination; it being understood, however, that any amount paid to Lender pursuant to Paragraph 4 above shall be applicable against such Shared Credit Production Bonus.

(c)      If no other person has been engaged or employed to render writing services in connection with the Picture prior to the commencement of principal photography thereof (other than with respect to a so-called "production polish"), Producer shall pay Lender an amount equal to the Shared Credit Production Bonus, which shall be deemed an advance against the Sole Credit Production Bonus, if any. Said advance shall be paid upon commencement of principal photography of the Picture. If Writer receives sole credit pursuant to Paragraph 5(a) hereinabove, subsequent to payment of the advance, Producer shall pay Lender the difference between the Shared Credit Production Bonus and the Sole Credit Production Bonus within ten (10) days following Producer's receipt of the Final WGA Credit Determination. If the advance is paid and Writer does not receive either sole or shared "Screenplay by" or "Written by" credit, then Lender shall return the advance to producer no later than five (5) days after Producer's receipt of Final WGA Credit Determination.

(c)      If, upon Final WGA Credit Determination, Writer is not entitled to receive sole or shared "Screenplay by" or "Written by" credit for the Picture, no additional consideration shall be payable to Lender hereunder.

6.    CONTINGENT CONSIDERATION:

(a)    If the Picture is produced, and, upon Final WGA Credit Determination, Writer is entitled to receive sole "Screenplay by" or "Written by" credit for the Picture, and provided further that Writer is not in material, uncured default hereof, Lender shall be entitled to receive an amount equal to five percent (5%) of one hundred percent (100%) of the "Net Proceeds", if any, derived from the exploitation of the Picture.

(b)    If the Picture is produced, and, upon Final WGA Credit Determination, Writer is entitled to receive shared "Screenplay by" or "Written by" credit for the Picture, Lender shall be entitled to receive contingent consideration in an amount equal to two and one-half percent (2.5%) of one hundred percent (100%) of the "Net Proceeds", if any, derived from the Picture.

(c)    If, upon Final WGA Credit Determination, Writer is not entitled to receive sole or shared "Screenplay by" or "Written by" credit for the Picture, no contingent consideration shall be payable to Lender hereunder.

(d)    For purposes of this Agreement, "Net Proceeds" shall be defined, computed, accounted for and paid in accordance with the definition of net proceeds utilized by the distributor of the Picture; otherwise, "Net Proceeds" shall be defined, computed, accounted for and paid in accordance with Producer's standard definition of "Net Proceeds" and shall be no less favorable for Writer than the definition accorded any other "Net Proceeds" participant. Producer makes no representation that the Picture will generate any "Net Proceeds", or any particular amount of "Net Proceeds". Such definition shall provide in any event, that "Net Proceeds" shall not include over budget adjustments, cross collateralization with other pictures, abandonment charges, interest on overhead, overhead on interest or interest on interest; provided however, such definition may include interest on investments and on print and advertising funds. Producer shall not be entitled to cross collateralize Contingent Consideration with union or guild residual payments or vice versa. Producer makes no representation that the Picture will generate any "Net Proceeds", or any particular amount of "Net Proceeds".

7.    SUBSEQUENT PRODUCTIONS:

Provided that Writer, upon Final WGA Credit Determination, shall have been accorded sole or shared "Screenplay by" credit in connection with the Picture and provided further that Writer is not in material, uncured default hereof, Writer shall have the right of first opportunity to write any derivative projects, including but not limited to, the applicable projects described below, on terms no less favorable than those provided for the Picture hereunder.

Provided that Writer, upon Final WGA Credit Determination, shall have been accorded sole "Screenplay by" or "Written by" credit in connection with the Picture and provided further that (i) Writer is not in material, uncured default hereof, and (ii) Writer does not elect to be engaged to write for the applicable productions described below, the following shall apply:

(a) Theatrical Sequel/Prequel: An amount equal to one-half (1/2) of the payments provided for in Paragraphs 4 and 5 actually paid to Writer, payable upon commencement of principal photography of such theatrical sequel (deemed to include a prequel herein), and a percentage of the Producer net proceeds (if any) of such theatrical sequel equal to one-half (1/2) of the percentage of Producer's net proceeds to which Writer actually becomes entitled in connection with the Picture.

(b) Theatrical Remake: Amounts equal to one-third (1/3) of the provided for in Paragraphs 4 and 5 actually paid to Writer, payable upon commencement of principal photography of such theatrical remake, and a percentage of the Producer net proceeds (if any) of such theatrical remake equal to one-third (1/3) of the percentage of Producer's net proceeds to which Writer actually becomes entitled in connection with the Picture.

(c) Television Motion Picture and/or Mini-Series and/or Direct-To Video Production: If Producer (or its assignee, designee or licensee) shall produce a United States prime-time network (i.e., ABC, CBS, NBC, FBC, CW) or premium cable (i.e., HBO or Showtime or TNT) television motion picture "Television Motion Picture"), mini-series ("Mini-Series"), or direct-to-video production ("DTV") which constitutes a sequel or remake of the Picture, Writer shall be entitled to the sum of Forty Thousand Dollars ($40,000) for each of the initial two (2) hours, and Twenty Thousand Dollars ($20,000) for each hour thereafter (pro-rated for lesser periods of time), payable upon commencement of principal photography of such production, provided that in no event shall the aggregate compensation required to be paid under this Paragraph 7(c) exceed One Hundred Thousand Dollars ($100,000), for each such Television Motion Picture, DTV or Mini-Series. For all other non-primetime or non-network television production, the foregoing shall be reduced by fifty percent (50%).

(i) If the Television Motion Picture, DTV or Mini-Series is released for general theatrical exhibition as a feature length motion picture in the U.S. and Canada prior to its initial U.S. television broadcast, Writer shall be entitled to receive a one-time payment in an amount equal to one hundred percent (100%) of the applicable royalties set forth in Paragraph 7(c) above, as payment in full for all theatrical exhibitions of the Television Motion Picture, DTV or Mini-Series in U.S. and Canada.

(ii) If the Television Motion Picture, DTV or Mini-Series is released for general theatrical exhibition in the U.S. and Canada subsequent to its initial U.S. television broadcast, Writer shall be entitled to receive a one-time payment in an amount equal to fifty percent (50%) of the applicable royalties set forth in Paragraph 7(c) above, as payment in full for all theatrical exhibition of the Television Motion Picture, DTV or Mini-Series in the U.S. and Canada.

(iii) If at any time (whether prior to subsequent to its initial U.S. television broadcast), the Television Motion Picture, DTV or Mini-Series is released for general theatrical exhibition outside the U.S. and Canada, Writer shall be entitled to receive a one-time payment in an amount equal to fifty percent (50%) of the applicable royalties set forth in Paragraph 7(c) above, as full payment in full for all theatrical exhibitions of Television Motion Picture, DTV or Mini-Series outside the U.S. and Canada.

Notwithstanding anything to the contrary contained in subparagraphs 7(c)(i) through 7(c)(iii) above, Writer in no event will be entitled to receive, pursuant to those subparagraphs, an amount exceeding one hundred percent (100%) of the royalty set forth in Paragraph 7(c), above, for theatrical release, if any, of the Television Motion Picture, DTV or Mini-Series.

(d)     Television Episodic Series. If Producer (or its assignee, designee or licensee) shall produce a United States prime-time network (i.e., ABC, CBS, NBC, FBC, CW) or premium cable (i.e., HBO or Showtime or TNT) television series ("Series") based upon the Picture, Writer shall be entitled to a royalty for each new Series episode produced and broadcast in accordance with the following:

| | |
|---|---|
| 0-30 minutes | $3,000 |
| 30-60 minutes | $4,000 |
| more than 60 minutes | $5,000 |

If any Series production is run for free television in the United States or Canada, Writer shall be paid for the second (2nd) run, third (3rd) run, fourth (4th) run and fifth (5th) run respectively, twenty percent (20%) of the applicable sum paid pursuant to Paragraph 7(d) hereinabove within thirty (30) days following the broadcast of the episode, it being understood that each such payment shall constitute a worldwide buy-out for all subsequent reruns and other uses of each such Series program.

(e)     Spinoffs: If a spinoff series is produced by Producer (or its assignee, designee or licensee) based upon a television series for which Writer was entitled to royalties hereunder, then Writer shall be entitled to a sum equal to fifty percent (50%) of the sum contained in subparagraph 8(d) above, for each such "generic" spinoff series and to a sum equal to twenty-five percent (25%) of the sum contained in subparagraph 7(d) above for each such "planted" spinoff series.

(f)     Non- Network Productions. In the event a non - network production (i.e., any broadcaster other than ABC, CBS, NBC, FBC, CW, HBO, TNT or Showtime) is produced by Producer (or its assignee, designee or licensee) based upon the Picture, Writer shall be entitled to an amount equal to one-half (½) of the applicable payment as set forth in Paragraphs 7 (c) and (d) above.

(g)     Theatrical Production. If within seven (7) years after the initial general theatrical release (if any) of the Picture, if Producer (or its assignee, designee or licensee) elects (in its sole discretion) to have written a screenplay for the initial live action theatrical sequel to and/or the initial live action theatrical remake of the Picture (collectively a "Theatrical Production") and provided Writer received sole "Written by" or "Screenplay by" credit for the Picture upon Final WGA Credit Determination and is then active as a writer in the theatrical motion picture industry and is available as, when and where reasonably required by Producer, then Producer shall first negotiate in good faith (within Producer's standard parameters, but in no event upon financial terms for Writer's writing services less favorable to Writer than the financial terms for Writer's writing services set forth in this Agreement) with Writer on the screenplay for the first such Theatrical Production. If Producer and Writer fail to agree on terms for Writer's services on such Theatrical Production within thirty (30) days following Producer's service of

notice on Writer of the commencement of negotiations therefor, if Writer is unavailable, or if Writer elects not to write, then Producer shall have the right to engage another writer(s) and shall have no further obligation to Writer except for payment of royalties, if any, to which Writer may be entitled pursuant to this Paragraph 7. If Producer and Writer enter into an agreement for the initial Theatrical Production, such agreement shall contain a provision substantially similar to this Paragraph 7(g).

(h)   <u>Television Production</u>. If within seven (7) years after the initial general theatrical release (if any) of the Picture, if Producer (or its assignee, designee or licensee) (in its sole discretion) to have written a screenplay for the initial live action television series of the Picture (<u>i.e.</u>, a pilot, initial episode of a series, DTV, a movie-of-the-week or miniseries, collectively a "Television Production") and provided Writer received sole "Written by" or "Screenplay by" credit for the Picture upon Final WGA Credit Determination and is then active as a writer in the theatrical motion picture and/or television industry and is available as, when and where reasonably required by Producer, then Producer shall first negotiate in good faith (within Producer's standard parameters) with Writer on the screenplay for the first such Television Production; provided, however, that Writer's engagement in connection with such Television Production shall be subject to network, licensee or other broadcaster approval (Producer shall make best efforts to obtain such approval). If Producer and Writer fail to agree on terms for Writer's services on such Television Production within thirty (30) days following Producer's service of notice on Writer of the commencement of negotiations therefor, if Writer is unavailable, or if Writer elects not to write, then Producer shall have the right to engage another writer(s) and shall have no further obligation to Writer except for payment of royalties, if any, to which Writer may be entitled pursuant to this Paragraph 7. If Producer and Writer enter into an agreement for the initial Television Production, such agreement shall contain a provision substantially similar to this Paragraph 7(h).

8.   <u>CREDIT:</u>

Writer's credit shall be accorded pursuant to the Writers Guild of America Basic Agreement (the "WGA Agreement"). Except as expressly detailed herein, all matters regarding credit, including size of type, placement, prominence, etc., shall be determined by Producer in its sole and absolute discretion. Any casual or inadvertent failure of Producer or of any third party to comply with the credit requirements set forth in this Paragraph 8, shall not be deemed to be a breach of this Agreement. Upon receipt of Writer's written notice to Producer, Producer shall use its reasonable efforts to cure prospectively any such failure to accord credit; provided, however that Producer shall have no obligation to change prints or advertising already produced. Producer shall contractually bind any third parties to the foregoing contractual obligations; provided that Producer's inadvertent failure to do so shall not be a breach of this Agreement.

9.   <u>GRANTS OF RIGHTS:</u>

(a) Writer hereby acknowledges and agrees that all of the results and proceeds of Writer's services hereunder are and will be created within the scope of Writer's employment by Producer, or shall be deemed to have been specially commissioned by Producer for use as part of a motion picture, as the case may be, and Writer further acknowledges and agrees that said results and proceeds are and shall be deemed a "work made for hire" within the meaning of the United States Copyright Law, and that Producer shall be deemed the author thereof and the

owner of all rights therein (including, without limitation, all copyrights and renewals and extensions thereof). In the event such results and proceeds are for any reason or in any jurisdiction determined not to be a "work made for hire," then Writer hereby irrevocably and exclusively transfers and assigns to Producer, in perpetuity, all rights (including, without limitation, all copyrights and renewals and extensions thereof) in and to such results and proceeds. Without limiting the generality of the foregoing, Writer hereby transfers and assigns to Producer the sole, exclusive, perpetual worldwide motion picture, television, and allied and incidental rights in and to the results and proceeds of Writer services (and any and all screenplays or other adaptations thereof whether heretofore or hereafter written by Writer or any other person), including, without limitation, theatrical, television (whether live, filmed, taped or otherwise recorded, and including series rights), cable, pay and subscription television, home video (including cassettes, discs and other video devices), live stage, computer-assisted media (including, without limitation, CD-I and CD-ROM), sequel, remake, advertising and promotion rights, publication rights; all rights to exploit, distribute and exhibit any motion picture or other production produced hereunder in all media, now known or hereafter devised; all rights to make any and all changes to and adaptions of the results and proceeds of Writer's services which Producer in its sole discretion may elect (it being agreed that Writer hereby waives any "moral rights" or similar rights to which Writer now or hereafter may be entitled); merchandising, soundtrack, music publishing and all exploitation rights whatsoever deriving from and/or relating to the results and proceeds of Writer's services; the right to use Writer's name and likeness in and in connection with the exploitation of any and all of the rights granted hereunder; and all other rights of any nature whatsoever in and to the results and proceeds of Writer's services in any and all media whether now known or hereafter developed in perpetuity throughout the universe.

(b) In connection with the foregoing grant of rights, Writer hereby expressly agrees to execute any and all documents consistent herewith and reasonably necessary or required by Producer in order to give full force and effect to said grant.

(d)      In the event that principal photography of the Picture has not commenced, subject to force majeure extensions, within five (5) years from the date of hereof, but before Producer has set a start date, Writer may elect to acquire all of Producer's rights in the property furnished by Writer to Producer hereunder by giving Producer written notice of its election to do so and also by payment to Producer by Writer in an amount equal to all sums received by Writer herein.

10.     REPRESENTATIONS AND WARRANTIES:

Subject to Article 28 of the WGA Agreement, Writer hereby represents and warrants to Producer as follows:

(a) Writer is free to enter into this Agreement and to grant the rights granted herein to Producer. Writer has not made and will not make any commitment, and has not done and will not do any act which is inconsistent with or in conflict with this Agreement or any of the rights granted or to be granted to Producer hereunder.

(b) All of the results and proceeds of Writer's services hereunder are and shall be wholly original with Writer (except to the extent that said result and proceeds are in the public domain and Writer has so notified Producer, and/or are supplied to Writer by Producer), and to

PAZ ESA Pizzo v6                                     8

the best of Writer's knowledge, will not violate or infringe upon any right of any kind or nature whatsoever of any third party including, without limitation, any copyright, right of privacy or publicity, or right to be free from libel or slander. The same warranties are made by Writer with reference to any and all material, incidents, treatments, characters and action which Writer may add to or interpolate in any material furnished to Writer by Producer.

(c) Writer has neither exercised nor authorized or permitted others to exercise any of the rights granted or to be granted or to be granted to Producer hereunder, and will not do so.

(d) Writer shall indemnify and hold harmless Producer, its successors, licensees and assigns from and against all claims, liabilities, actions or causes of action, judgments, recoveries, damages, costs and expenses (including reasonable outside attorneys' fees and disbursements) arising out of or in connection with any breach of any Writer's representations, warranties and agreements herein. Producer shall indemnify and hold harmless Writer, its successors, licensees and assigns from and against all claims, liabilities, actions or causes of action, judgments, recoveries, damages, costs and expenses (including reasonable outside attorneys' fees and disbursements) arising out of or in connection with any material supplied to Writer by Producer or furnished/changed material by Producer and otherwise arising in connection with the development, production, distribution and/or exploitation of the Picture and any element thereof, in all media now known or hereafter devised worldwide in perpetuity.

(e) Lender is a duly organized and existing corporation in good standing under the laws of its place and country of incorporation, and has the exclusive right, power and authority to enter into this Agreement, to grant the rights agreed to be granted by Lender hereunder and to furnish the services of Writer as herein under a valid and subsisting exclusive contract of employment pursuant to which Lender employs Writer for a term extending at least until the completion of all services required of Writer hereunder, and if Lender was incorporated outside the United States of America, it is not engaged in any trade or business in the United States and does not have a "permanent establishment" in the United States (as that term is defined in the Tax Treaty between the United States and the country of incorporation), and it does not have any agent in the United States who has, or habitually exercises, general authority to negotiate and conclude contracts on its behalf.

(f) Lender will make all payments of compensation paid to Lender by Producer and required to be made to Writer on account of the services rendered by Writer pursuant to this Agreement and by reason of the exploitation of any rights granted to Producer hereunder. Provided that Producer has paid Lender all sums due Lender hereunder and except as provided by the WGA Agreement, Producer shall have no responsibility for or liability on account of any and all obligations with respect to Writer and Writer's services hereunder, including, but not limited to, obligations with respect to tax withholdings, worker's compensation laws, national health insurance, social security and unemployment and disability insurance.

11.   REMEDIES:

Writer hereby acknowledges that the services of Writer to be performed hereunder are of a unique and extraordinary character, the loss of which cannot be adequately compensated by damages, and that a breach of this Agreement by Writer will cause Producer irreparable harm. Producer shall be entitled to seek injunctive or other equitable relief to prevent a breach by

Writer of this Agreement, in addition to any other remedies Producer may have. In the case of a breach by Producer of any of Producer's obligations hereunder, Writer's sole right and remedy shall be an action at law for damages, and Writer specifically waives any right to injunctive or other equitable relief, to rescind this Agreement or any of the rights granted to Producer hereunder or to terminate this Agreement.

12.   ASSIGNMENT:

Producer shall have the unencumbered right to assign this Agreement, in whole, or in part; provided, however, that Producer shall remain secondarily liable hereunder, except in the case of an assignment to a major or mini-major distributor or a similarly financially responsible third party who assumes all obligations to Writer in writing. Writer shall not have the right to assign this Agreement.

13.   TRAVEL:

If Producer or a third party financier requires Writer to travel to a location which is more than fifty (50) miles from Writer's principal place of residence ("Location"), Producer shall provide Writer with: (i) one (1) first-class, round-trip transportation (if available and used), by air (if available and if appropriate) to and from the Location; (ii) first-class hotel accommodations (room and tax only); (iii) exclusive ground transportation to and from all airports, hotels and sets; and (iv) a per diem to be negotiated in good faith. In the event Writer is required to stay at the Location in excess of two (2) consecutive weeks, Producer shall provide, on a one (1) time only basis, one (1) additional first-class, round-trip transportation (if available and used) by air (if available and if appropriate) to and from the Location for Writer or Writer's non-business related guest.

14.   NOTICES:

All notices, payments and correspondence that any party hereto is required, or may desire, to serve upon any other party hereto may be served by delivering same to the party personally or by depositing the same in the United States mail, first class postage pre-paid, or by sending the same, by facsimile (with confirmation). The date of: (i) such personal delivery; (ii) the next business day after the date of telecopying (with confirmation); or (iii) the date five (5) business days after the date of mailing shall be the date of giving such notice. A copy of such notices shall be sent as follows, or to other such addresses as the parties may hereafter designate in writing:

WRITER:                          PRODUCER:
Q&A Productions, Inc.            Paz Productions, LLC
c/o Greenlit Creative
1411 Fifth Street, Suite 506
Santa Monica, CA 90401
Attn.: David Greenblatt

with copies to:
Bloom Hergott Diemer Rosenthal
LaViolette Feldman Schenkman
& Goodman, LLP
150 S. Rodeo Drive, Third Floor
Beverly Hills, CA 90212
Attn.: Alan S. Hergott, Esq. And
Leif W. Reinstein, Esq.

with copies to:
Emerson E. Bruns, PLLC
1790 Broadway, 20th Floor
New York, NY 10019
Attn: Emerson E. Bruns, Esq.

with copies to:

with copies to:
Mark A. Ragone, Esq.
76 Ninth Avenue, Suite 1110
New York, NY  10011

15.    GENERAL LIABILITY/E & O INSURANCE:

Producer shall add Lender and Writer as an additional insured under Producer's general liability and errors and omissions policy in connection with the Picture, if any, subject to the terms and conditions of said policy, including any deductible or policy limits; provided, however, the inclusion of Writer on such policy will not relieve Writer from Writer's representations, warranties and indemnities contained herein and no such policy will cover any claims or demands to which Writer's indemnification of Producer applies.

16.    PREMIERE/FESTIVALS:

Upon condition that Writer shall fully perform all services and obligations required to be performed by him hereunder, and provided that Writer is not in material, uncured default hereunder, Producer shall invite Writer and one (1) guest to attend all celebrity premieres and film festival screenings, if any, of the Picture.  In the event such premiere or festival is more than fifty  (50) miles from Writer's then current place of residence, Producer shall use reasonable good faith efforts to require the distributor of the Picture to provide Writer with the following: (i) one (1) round-trip, first-class air transportation, if available and if used, for Writer and Writer's guest; (ii) first-class hotel accommodations (room and tax only); and (iii) reasonable expenses incurred in connection with or arising from the attendance of Writer and/or Writer's guest at any such premiere.

17.    DVD/SOUNDTRACK:

Upon condition that Writer shall fully perform all of the services and obligations required to be performed by Writer hereunder and that Writer is not in material, uncured default hereunder, Writer shall be entitled to one (1) copy of the DVD and soundtrack for the Picture upon commercial availability of the same.

18.   MISCELLANEOUS:

This Agreement shall be governed by, construed and enforced under the laws of the State of California.  If for any reason any provision of this Agreement is adjudged by a court to be unenforceable, such adjudication shall in no way affect any other provisions of this Agreement or the validity or enforcement of the remainder of this Agreement, and the affected provision shall be modified or curtailed only to the extent necessary to bring it into compliance with applicable law. This Agreement expresses the entire understanding between Writer and Producer, and supersedes any previous agreement, whether written or oral, between the parties. This Agreement may be modified or amended only by a writing signed by the party to be charged with said modification or amendment.

19.   STANDARD TERMS AND CONDITIONS.

All other terms and conditions of Writer's employment hereunder are set forth in the Standard Terms and Conditions attached hereto as Exhibit "A," which Standard Terms and Conditions are by this reference incorporated herein and made part of this Agreement.

IN WITNESS WHEREOF, this document has been executed as of _____, 2010.


PAZ PRODUCTIONS, LLC:


By:_____
        An Authorized Signatory

Q&A PRODUCTIONS, INC.


By:_____
        An Authorized Signatory
Fed ID#:_____

Exhibit "A"

STANDARD TERMS AND CONDITIONS

These Standard Terms and Conditions shall constitute a part of that certain agreement (the "Agreement") dated as of _____, 2010, between Paz Productions, LLC ("Producer"), and Q&A Productions, Inc. ("Lender") f/s/o Angelo Pizzo, (collectively referred to herein as "Writer"), in connection with the motion picture presently entitled "Paz" (the "Picture"). All terms used in these Standard Terms and Conditions shall, unless expressly provided to the contrary herein, have the same respective meanings as set forth in the Agreement. These Standard Terms and Conditions shall be subject to the Agreement and, accordingly, unless expressly provided to the contrary herein, to the extent that any provision of these Standard Terms and Conditions conflicts with any provision of the Agreement, the Agreement shall control.

A-1.   Default: Upon any material breach by Writer of any of the provisions of this Agreement, Producer shall immediately have the right, exercisable at any time after becoming aware of such breach, to suspend Writer's engagement hereunder and/or to terminate Writer's engagement by so notifying Writer in writing. Producer's election to suspend Writer's engagement hereunder shall not affect its right thereafter to terminate same. Notwithstanding the foregoing, provided that an event of default is capable of being cured, Producer shall not terminate this Agreement for material breach or default unless Producer has first given Writer written notice of such breach or default and Writer has failed to cure same within three (3) business days after receipt of such notice. This right to cure shall be on a one time only basis (i.e., once Writer has been afforded the opportunity to cure a default or breach, Writer shall not thereafter have the right to cure a subsequent breach or default, whether the same or a different breach or default).

In the event of a suspension pursuant to this Paragraph A-1, Producer's obligation to make the payments described in the Agreement shall likewise be suspended; provided however, that Producer shall be obligated to make payment for all material delivered and steps postponed, a Deferral, pursuant to Paragraph 3(d). In the event of a termination pursuant to this Paragraph A-1, no additional payments shall be payable to Writer hereunder except to the extent accrued prior to termination. The foregoing shall in no way limit any other remedy, if any, which Producer may have against Writer, including, without limitation, the right to recover all monies theretofore paid to Writer hereunder.

A-2.   Force Majeure: If the preparation or production of the Picture is materially interrupted or prevented due to an event of force majeure (as the term is customarily defined in the motion picture and television industries), including, without limitation, and act of God, war (whether declared or undeclared), riot, civil commotion, fire, casualty, strike (including a strike by members of any guild or labor union), boycott, labor dispute, act of any federal, state or local authority, the death, incapacity or default of the director, the director of photography, a principal member of the cast of the Picture, or other key personnel, or for any other similar reason beyond Producer's control, Producer shall have the right to suspend this Agreement while such event continues (and for such period after its abatement as may be required for Producer to resume production of the Picture) and/or to terminate Writer's engagement hereunder. Producer's election to suspend Writer's engagement hereunder shall not affect its right hereafter to terminate

same.

In the event of a suspension pursuant to this Paragraph A-2, Producer's obligation to make the payments described in the Agreement shall likewise be suspended. In the event of a termination pursuant to this Paragraph A-2, Producer and Writer shall each be released from all of their respective executory obligations with respect to Writer's services and the payments, if any, theretofore accrued to Writer, when paid, shall be deemed payment in full of the compensation payable to Writer with respect to Writer's services.

In the event of a suspension pursuant to this Paragraph A-2, Producer's obligation to make the payments (other than vested but unpaid compensation) described in the Agreement shall likewise be suspended. In the event of a termination pursuant to this Paragraph A-2, Producer and Writer shall each be released from all of their respective executory obligations (other than vested but unpaid compensation) with respect to Writer's services (excluding credit, insurance and indemnity obligations, as applicable) and the payments, if any, vested and/or accrued to Writer, including, without limitation, contingent compensation, when paid, shall be deemed payment in full of the compensation payable to Writer with respect to Writer's services.

Notwithstanding any provision to the contrary contained herein, Writer shall not be suspended or terminated pursuant to an event of force majeure more than one (1) time nor unless all other above-the-line personnel are suspended and/or terminated, as applicable. In the event of a suspension pursuant to this Paragraph A-2, Writer shall have the right to be reinstated on the terms and conditions hereof, if any other above-the-line personnel is reinstated within one (1) year after commencement of such suspension or termination, provided that Writer is not incapacitated or impaired in any manner that would materially interfere with Writer's required services hereunder, and provided that Writer is ready, willing and able to render services hereunder as, when and where required by Writer at such later date. Such services shall be rendered for no additional compensation beyond that set forth in Paragraphs 4, 5 and 6 of the Agreement.

A-3.    Disability: If Writer shall suffer any mental and/or physical injury, impairment, sickness or other incapacity (any of the foregoing being referred to herein as a "disability") which detracts from Writer's performance of services to the full extent required by Producer hereunder, Producer shall have the right to suspend Writer's engagement while such disability continues. In the event Writer dies or such suspension(s) shall last longer than seven (7) consecutive days or fourteen (14) days in the aggregate, Producer shall have the right to terminate Writer's engagement. Producer's election to suspend Writer's engagement shall not affect its right thereafter to terminate same if the disability continues.

In the event of a suspension pursuant to this Paragraph A-3, Producer's obligations to make the payments described in the Agreement shall likewise be suspended. In the event of a termination pursuant to this Paragraph A-3, Producer and Writer shall each be released from all of their executory obligations with respect to Writer's services hereunder and the payments, if any, theretofore accrued to Writer, when paid shall be deemed payment in full of the compensation payable to Writer with respect to Writer's services.

A-4. <u>Effect of Expiration or Termination</u>: Notwithstanding anything to the contrary contained in this Agreement, neither the expiration nor the termination of this Agreement for any reason shall affect the ownership by Producer of the results and proceeds of the services rendered by Writer hereunder, or alter or limit any of the rights or privileges of Producer or any warranty, representation, covenant or undertaking on the part of Writer hereunder.

A-5. <u>No Obligation to Proceed</u>: Nothing herein contained shall in any way obligate Producer to use the Screenplay, Writer's services hereunder, or to include the results and proceeds of Writer's services in the Picture or to produce, proceeds of Writer's services in the Picture or to produce, exhibit, advertise or distribute the Picture; provided, however, nothing contained in this paragraph shall relieve Producer of its obligation to pay Writer the compensation specified in the Agreement and herein, and Producer's obligations to Writer hereunder shall be deemed fully performed by payment of said amounts.

A-6. <u>Injunctive Relief</u>: Writer acknowledges and agrees that the services to be rendered by Writer hereunder are of a special, unique, unusual, extraordinary and intellectual character, making them difficult to replace and giving them a peculiar value, the loss of which cannot be reasonably compensated in damages in an action at law; that if Writer breaches any material provision of this Agreement, Producer shall be entitled, as a matter of right, at its election, to seek to enforce this Agreement and all of the provisions hereof by injunction or other equitable relief.

A-7. <u>Remedies</u>: The remedies herein provided shall be deemed cumulative and the exercise of one shall not preclude the exercise of any other. Both parties hereto specifically agree that either of the parties may seek to recover by applicable party by any failure, refusal or neglect of the other party to keep and perform their agreements and warranties herein contained. No waiver by either of the parties hereto of any condition of this Agreement shall be deemed to be a waiver of any preceding or succeeding breach of the same, or any other, covenant or condition.

A-8. <u>Breach of Agreement</u>: No act or omission of Producer hereunder shall constitute an event of default or breach of this Agreement unless Writer shall first notify Producer in writing setting forth such alleged breach or default and Producer shall not cure the same within thirty (30) days after receipt of such notice or seven (7) days with respect to payment of compensation, Writer shall be limited to Writer's remedy at law for damages, if any, and shall not have the right to terminate or rescind this Agreement or to enjoin or restrain in any way the production, distribution, advertising or exploitation of the Picture, or any parts or elements thereof or rights herein.

A-9. <u>Assignment</u>: Producer shall have the unencumbered right to assign this Agreement in any manner and to any person, firm or corporation that Producer shall determine and Producer shall be relieved of its obligations to Writer hereunder by reason of such assignment; provided, however, that Producer shall remain secondarily liable hereunder, except in the case of an assignment to a major or mini-major distributor or a similarly financially responsible third party who assumes all obligations to Writer in writing. Writer shall not have the right to assign this Agreement.

A-10. <u>Publicity</u>: Writer warrants and agrees that Writer shall not authorize the publication of any news story, magazine article or other publicity or information of any kind or nature relating to the picture or Writer's services hereunder or to Producer or to any exhibitor or any distributor of the Picture without the prior written consent of Producer in each instance; provided, however, that Writer may issue personal publicity primarily concerning Writer in which the Picture is mentioned incidentally, so long as such references to the Picture are not derogatory.

A-11. <u>Commitments to Others</u>: Writer shall have no right or authority to and shall not employ any person in any capacity, nor contract for the purchase or rental of any article or material, or make any commitment, agreement or obligation whereby Producer shall be required to pay any monies or other consideration without Producer's prior written consent in each instance.

A-12. <u>Right to Withhold</u>: Producer shall have the right to deduct and withhold from any amounts required to be deducted and withheld by Producer pursuant to any present or future law, ordinance or regulation of the United States of America, or of any state thereof or any subdivision of any state thereof, out of any other country, including, without limitation, any country wherein Writer performs any services hereunder. Notwithstanding the foregoing, this Agreement does not constitute a partnership, joint venture or an employment relationship and the parties hereto acknowledging that Writer is an independent contractor with regards to Producer.

A-13. <u>Promotional Services</u>: Writer shall be available, as, when and where Producer shall reasonably require, to participate in such publicity and promotional tours and activities, photo sessions, interviews, personal appearances, premieres and the like (collectively, "Promotional Services") as Producer may request and the compensation specified in the Agreement shall constitute full and complete consideration to Writer for such Promotional Services. If Producer requires Writer to render Promotional Services hereunder at a place which is more than fifty (50) miles from Writer's principal residence, Producer shall provide Writer with, or reimburse Writer for (at Producer's election), the first-class travel, hotel accommodations, expenses and reasonable living expenses (if applicable) which are (a) approved by Producer in advance of their being incurred by Writer and (b) actually incurred by Writer directly in connection with any promotional or publicity services which Producer may require of Writer hereunder.

A-14. <u>Collective Bargaining Agreement</u>: Writer is now and during the time period Writer is to render services to Producer hereunder will remain a member in good standing of the Writers Guild of America. Producer represents and warrants that it is a signatory to the applicable WGA Agreement currently in effect. This Agreement and Writer's services hereunder shall be subject to and rendered in accordance with the applicable terms and provisions of the applicable WGA Agreement in effect. Nothing contained herein shall be construed so as to require the violation of the WGA Agreement, which by its terms is controlling. In no event shall the amounts paid by Producer to Lender exceed the amount which would have been paid by Producer had producer employed Writer directly. Producer shall have no obligation to reimburse Lender for employment taxes of any kind or nature.

A-15.<u>Miscellaneous</u>: This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, supersedes any previous agreement (whether written or oral), and shall not be modified except by a written document executed by all parties. Paragraph headings are for the convenience of the parties only and shall have no legal effect or validity.  If for any reason any provision of this Agreement is adjudged by a court to be unenforceable, such adjudication shall in no way affect any other provisions of this Agreement or the validity or enforcement of the remainder of this Agreement, and the affected provision shall be modified or curtailed only to the extent necessary to bring it into compliance with applicable law.

END OF STANDARD TERMS

## CERTIFICATE OF AUTHORSHIP

The undersigned hereby certifies that, pursuant to an agreement ("Agreement") between PAZ PRODUCTIONS, LLC ("Producer"), and Q&A PRODUCTIONS, INC. f/s/o ANGELO PIZZO ("Writer"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Writer has rendered and will continue within the terms of said agreement to render writing services to Producer in connection with a proposed feature-length, theatrical motion picture presently entitled "Paz" (the "Picture"); that all of the results and proceeds of such services are and will be created within the scope of Writer's employment by Producer and are and will be deemed to have been specifically ordered or commissioned by Producer for use as part of a motion picture, that such results and proceeds are and will be a work made for hire within the meaning of the United States Copyright Law and that Producer shall be deemed to be the author thereof and the owner of all rights therein, with the right to make such changes therein and such uses thereof as Producer may from time to time determine as the author thereof. Writer hereby represents and warrants that, except with respect to material supplied to Writer by Producer, the results and proceeds of Writer's services hereunder are and will be original with Writer, to the best of Writer's knowledge after the exercise of reasonable diligence, do not and will not defame, infringe or violate the rights of privacy or other rights of any third party and are not the subject of any litigation or claim that give rise to litigation. Writer hereby agrees to indemnify Producer, its licensees and assigns against any loss, cost or damage (including reasonable outside attorneys' fees and disbursements) arising out of or in connection with any breach of any of the aforesaid representations, warranties or certifications, and to execute such documents consistent herewith and do such other acts and deeds as may be required by Producer or its licensees and assigns to further evidence or effectuate Producer's rights hereunder. Producer's rights in and to the results and proceeds of Writer's services and/or license shall be binding upon the undersigned and inure to the benefit of such assignee and/or licensee. In the event of a conflict between the Agreement and this Certificate Of Authorship, the Agreement shall control

IN WITNESS WHEREOF, this document has been executed as of *July 5*, 2010.

Q&A PRODUCTIONS, INC.

By: _____
     An Authorized Representative

Dated as of ⟶ 74/45, 2010

Gentlemen:

Reference is made to the agreement dated concurrently herewith ("Lending Agreement") between Q&A Productions, Inc. ("Lender") and you, covering the lending of the services of the undersigned to you.

As an inducement to you to enter into the Lending Agreement and as a material part of the consideration moving to you for so doing, the undersigned hereby represents, warrants and agrees as follows:

1. That the undersigned has heretofore entered into a valid and subsisting agreement (herein called the "Employment Agreement") with Lender covering the rendition of the undersigned's services for Lender, and under which the undersigned is obligated to render the undersigned's services for at least the full term of the engagement of the undersigned's services under the Lending Agreement, and that Lender has the right and authority to enter into the Lending Agreement and to furnish to you the rights and services of the undersigned upon the terms and conditions therein specified.

2. That the undersigned is familiar with each and all of the terms, covenants, conditions, representations, acknowledgments, and warranties of the Lending Agreement and hereby consents to the execution thereof; that the undersigned will be bound by and will duly observe, perform and comply with each and all of the terms, covenants and conditions of the Lending Agreement on the part of the undersigned to be performed and complied with; that the undersigned shall render to you all of the services which are to be rendered by the undersigned pursuant to the Lending Agreement, even if Lender shall be dissolved or shall otherwise cease to exist, that the undersigned represents, acknowledges, and warrants in the same manner all matters and things that Lender represented, acknowledged, or warranted in the Lending Agreement; and that the undersigned hereby confirms that there have been granted to Lender all of the rights granted by Lender to you under the Lending Agreement.

3. That the undersigned is under no obligation or disability by law or otherwise which would prevent or restrict the undersigned from performing and complying with all of the terms, covenants and conditions of the Lending Agreement on the part of the undersigned to be performed or complied with.

4. Provided that you satisfy your payment obligations, that the undersigned will look solely to Lender or its associated or subsidiary companies and not to you for all compensation and other remuneration for any and all services and rights which the undersigned may render and grant to you under the Lending Agreement.

5. That you shall be entitled to seek equitable relief against the undersigned, by injunction or otherwise, to restrain, enjoin and/or prevent the violation or breach by the undersigned of any obligation of the undersigned to be performed, as provided in the Lending Agreement and/or the violation or breach by the undersigned of any obligations or agreements under this present instrument.

PAZ ESA Pizzo v6                                    19

6. Provided that you satisfy your payment obligations, that the undersigned will indemnify and hold you harmless from and against any and all taxes which you may have to pay and any and all liabilities (including judgments, penalties, interest, damages, costs, expenses and reasonable outside attorneys' fees, whether or not litigation is commenced) which may be obtained against or suffered by you or which you may incur by reason of your failure to deduct and withhold from the compensation payable under the Lending Agreement any amounts required or permitted to be deducted and withheld from the compensation of Writer.

7. That the undersigned will not amend or modify the Employment Agreement in any particular that would prevent or interfere with the performance of the undersigned's services for you or the use and ownership of the results and proceeds thereof, pursuant to the Lending Agreement.

Very truly yours,

ANGELO PIZZO

------Original Message------
From: Angelo Pizzo
To: Chad
Subject: Re: PAZ
Sent: Apr 25, 2011 1:59 AM

I have been very very sick, a horrible virus in my gut, haven't been
able to digest anything for weeks, have lost 15 lbs. no anti bacterial
meds work, have made things worse.
But despite this, everything you say is correct, it is my fault it has
come to this, I have been negligent in a severe way. I have never sent
an incomplete script, I will finish, I am trying to gain strength,
mentally it's hard to focus but I WILL GET THIS DONE. You will
definitely have a script by your May 10 date, but I'm hoping I can get
it to you by this weekend if my brain can focus up. Chad, you have
every right to be furious with me, my present illness is no excuse, I
should have had this finished long ago. I'm been facing terrible
blocks, but I've made some breakthroughs, it will be good. I can't say
I'm sorry enough times.
I will call Vinnie tomorrow and apologize reassure him...


EXHIBIT
B

1   LATIFAH SALOM
    Business Representative
2   WRITERS GUILD OF AMERICA, WEST, INC.
    7000 W. Third Street
3   Los Angeles, California 90048

4   (323) 782-4521

5   Representative for Complainants

6

7

8        BEFORE THE WRITERS GUILD OF AMERICA, WEST, INC. – PRODUCERS

9                          ARBITRATION TRIBUNAL

10

| 11 | In the Matter of the Arbitration between | NOTICE OF CLAIM |
|----|---|---|
| 12 | WRITERS GUILD OF AMERICA, WEST, INC. and ANGELO PIZZO, | SUBMITTED TO |
| 13 | Complainants, | ARBITRATION AND |
| 14 | vs. | CLAIM |
| 15 | PAZ PRODUCTIONS, LLC and CHAD A. VERDI, | CASE NO. 11-CO-049 |
| 16 | Respondents. | |
| 17 | Relating to unpaid compensation in connection with the theatrical motion picture project entitled "PAZ: THE VINNY PAZIENZA STORY" | |
| 18 | | |

19   TO ALL PARTIES AND THEIR COUNSEL:

20        PLEASE TAKE NOTICE that the WRITERS GUILD OF AMERICA, WEST, INC.

21   ("WGAW") submits the above-captioned Claim to arbitration pursuant to Articles 10, 11 and 12 of

22   the Writers Guild of America 2008 Theatrical and Television Basic Agreement ("MBA"). Pursuant

23   to Article 11.A.1.c. of the MBA, submission of this Claim to steps 1 and 2 of the grievance

24   procedure is waived.

25        We have ten (10) days from your receipt of this Notice to mutually agree upon an arbitrator.

26   If we are unable to reach such an agreement within that time period, an arbitrator will be selected in

27   accordance with the procedures of MBA Article 11.C.2. The nature of the Claim referred to herein

28   is as follows:

                                        1

EXHIBIT

## CLAIM

[Pertaining To All Counts]

1.      Paz Productions, LLC ("Paz Productions") is signatory or otherwise bound to the MBA.

2.      During the term of the MBA, Chad A. Verdi signed a letter personally guaranteeing the MBA obligations of Paz Productions including, but not limited to, the obligations outlined herein.

3.      Respondents Paz Productions and Mr. Verdi (collectively "Respondents") are therefore jointly and severally liable for any and all MBA obligations in connection with the high budget theatrical motion picture project entitled "Paz: The Vinny Pazienza Story" ("Project") including, but not limited to, the obligations outlined herein.

4.      On or about July 5, 2010, Respondents entered into an employment agreement ("Agreement") with Angelo Pizzo ("Writer") to engage Writer for writing services consisting of a first draft screenplay and a rewrite in connection with the Project.

5.      Pursuant to the terms of the Agreement, in exchange for his writing services Respondents agreed to pay to Writer guaranteed compensation in the amount of Two Hundred Thousand Dollars ($200,000) payable as follows: Sixty Thousand Dollars ($60,000) upon Writer's execution of the Agreement; Sixty Thousand Dollars ($60,000) upon delivery of the first draft screenplay ("First Draft Screenplay"); Forty Thousand Dollars ($40,000) upon commencement of writing services for the rewrite ("Rewrite"); and Forty Thousand Dollars ($40,000) upon delivery of the Rewrite.

6.      Pursuant to the terms of the Agreement, in or around September of 2010, Writer received a payment of Sixty Thousand Dollars ($60,000) upon execution of the Agreement.

7.      MBA Article 13.A.14. provides in relevant part:

> Company will use its best efforts to pay writers employed to write on a deal basis not less than the applicable minimum within forty-eight (48) hours after the delivery of a completed story, treatment or original treatment, first draft screenplay or final draft screenplay, as the case may be, but in no event shall any such payment be made later than seven (7) days after delivery of such material . . . .

//

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT I**

[Failure To Pay Pension Plan and Health Fund Contributions –

First Draft Screenplay Commencement]

    8.    Pursuant to Article 17 of the MBA, Respondents are required to make Pension Plan and Health Fund contributions on behalf of Writer on the compensation paid in connection with Writer's commencement of writing services on the First Draft Screenplay and the execution of the Agreement at the rate of six percent (6%) and eight and a half percent (8.5%), respectively, which contributions total Eight Thousand, Seven Hundred Dollars ($8,700.00).

    9.    Respondents have failed, and continue to fail and refuse to pay Pension Plan and Health Fund contributions on behalf of Writer on the compensation paid in connection with Writer's commencement of writing services on the First Draft Screenplay and the execution of the Agreement, which contributions in the amount of Eight Thousand, and Seven Hundred Dollars ($8,700.00) are currently due, owing, and unpaid.

    10.    Pursuant the Article 17 of the MBA and the Trust Agreements, Respondents are required to pay interest on the unpaid Pension Plan and Health Fund contributions owed on behalf of the Writer at the rate of eighty-three one hundredths of one percent (.83%) per month commencing to accrue when the contributions owed became due, and continuing to accrue until paid in full.

**COUNT II**

[Failure To Pay Guaranteed Compensation –

First Draft Screenplay Delivery]

    11.    Writer wrote, and on or about May 27, 2011, delivered the First Draft Screenplay to Respondents. Respondents accepted delivery of the First Draft Screenplay and at that time should have paid Writer Sixty Thousand Dollars ($60,000) in accordance with the terms of the Agreement.

    12.    In breach of the MBA and the Agreement, Respondents failed, and continue to fail, to pay Writer the guaranteed compensation due in connection with the delivery of the First Draft Screenplay, in the amount of Sixty Thousand Dollars ($60,000), which amount is currently due, owing, and unpaid.

3

1      13.   Pursuant to Article 13.A.14 of the MBA, Respondents are required to pay interest on

2 the unpaid compensation in connection with the delivery of the First Draft Screenplay at the rate of

3 one and one-half percent (1.5%) per month, commencing to accrue when payments became due, and

4 continuing to accrue until payments are made in full.

5      14.   Pursuant to Article 17 of the MBA, Respondents are required to make Pension Plan

6 and Health Fund contributions on behalf of Writer on the unpaid compensation due in connection

7 with the First Draft Screenplay at the rate of six percent (6%) and eight and a half percent (8.5%),

8 respectively, which contributions total Eight Thousand, Seven Hundred Dollars ($8,700.00). .

9      15.   Respondents have failed, and continue to fail and refuse to pay Pension Plan and

10 Health Fund contributions on behalf of Writer on the unpaid compensation due in connection with

11 the First Draft Screenplay, which contributions in the amount of Eight Thousand, Seven Hundred

12 Dollars ($8,700.00) are currently due, owing, and unpaid.

13      16.   Pursuant to Article 17 of the MBA and the Trust Agreements, Respondents are

14 required to pay interest on the unpaid Pension Plan and Health Fund contributions owed on behalf of

15 the Writer at the rate of eighty-three one hundredths of one percent (.83%) per month commencing

16 to accrue when the contributions owed became due, and continuing to accrue until paid in full.

17                    **COUNT III**

18           [Failure To Pay Guaranteed Compensation – Rewrite]

19      17.   Pursuant to the Agreement, following Writer's delivery of the First Draft Screenplay,

20 Respondents should have commenced Writer on the Rewrite and paid Writer guaranteed

21 compensation in the amount of Forty Thousand Dollars ($40,000).

22      18.   In breach of the MBA and the Agreement, Respondents have failed, and continue to

23 fail, to pay Writer the guaranteed compensation due in connection with commencement of the

24 Rewrite in the amount of Forty Thousand Dollars ($40,000), which amount is currently due, owing,

25 and unpaid.

26      19.   In further breach of the MBA and the Agreement, Respondents have failed, and

27 continue to fail, to pay Writer his guaranteed compensation due in connection with the delivery of

28

1  the Rewrite in the amount of Forty Thousand Dollars ($40,000), which amount is currently due,

2  owing, and unpaid.

3      20.    Pursuant to Article 13.A.14. of the MBA, Respondents are required to pay interest on

4  the unpaid gross compensation due for commencement and delivery ($80,000) of the Rewrite at the

5  rate of one and one-half percent (1.5%) per month, commencing to accrue when payments became

6  due, and continuing to accrue until payments are made in full.

7      21.    Pursuant to Article 17 of the MBA, Respondents are required to make Pension Plan

8  and Health Fund contributions on behalf of Writer on the aggregate amount of unpaid compensation

9  due in connection with the commencement and delivery of the Rewrite ($80,000) at the rate of six

10  percent (6%) and eight and a half percent (8.5%), respectively, which contributions total Eleven

11  Thousand, Six Hundred Dollars ($11,600).

12      22.    Respondents have failed, and continue to fail and refuse to pay Pension Plan and

13  Health Fund contributions on behalf of Writer on the aggregate amount of unpaid compensation due

14  in connection with the Rewrite, which contributions in the amount of Eleven Thousand, Six Hundred

15  Dollars ($11,600) are currently due, owing, and unpaid.

16      23.    Pursuant to Article 17 of the MBA and the Trust Agreements, Respondents are

17  required to pay interest on the unpaid Pension Plan and Health Fund contributions owed on behalf of

18  the Writer at the rate of eighty-three one hundredths of one percent (.83%) per month commencing

19  to accrue when the contributions owed became due, and continuing to accrue until paid in full.

20  **PRAYER FOR RELIEF**

21      WHEREFORE, Complainants pray for issuance of an award as follows:

22      a.    An order requiring Respondents, and each of them, to pay the guaranteed

23  compensation due in connection with the First Draft Screenplay and the Rewrite in the total amount

24  of One Hundred Forty Thousand Dollars ($140,000), plus interest thereon;

25      b.    An order requiring Respondents, and each of them, to pay Pension Plan and Health

26  Fund contributions on behalf of Writer in connection with the total paid and unpaid compensation

27  due for the First Draft Screenplay and the Rewrite, in the aggregate amount of Twenty-Nine

28  Thousand Dollars ($29,000), plus interest thereon; and

5

1     c.     Such other and further relief as the arbitrator deems just and proper.

2

3                   WRITERS GUILD OF AMERICA, WEST, INC.

4

5    DATE: _March 14, 2012_    BY: _____

6                         LATIFAH SALOM

                            Representative for Complainants

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28